**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: March 30 2018

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **In Re:** | ) | **Case No. 17-32181** |
| | ) | |
| Micah Thomas Shoup and | ) | **Chapter 7** |
| Mary Kay Shoup | ) | |
| | ) | |
| **Debtors.** | ) | **JUDGE JOHN P. GUSTAFSON** |

### MEMORANDUM OF DECISION RE: U.S. TRUSTEE'S MOTION TO DISMISS

This case comes before the court on the United States Trustee's ("the UST") Motion to Dismiss Debtors Micah Thomas Shoup and Mary Kay Shoup's ("Debtors") Chapter 7 case ("Motion") for abuse pursuant to 11 U.S.C. §707(b)(1) and (3) [Doc. #14] and Debtors' response ("Response") [Doc. #19]. Debtors' Response was filed by attorney Randy L. Reeves ("Debtors' Counsel"). An Order for Evidentiary Hearing was entered, setting a trial date of October 26, 2017. [Doc. #15]. The court held an evidentiary hearing on the Motion that Debtors, Debtors' Counsel, Counsel for the UST, and bankruptcy auditor for the UST Catherine Lowman attended in person. At the hearing, the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. §1334(a) as a case under Title 11. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1939, 191 L.Ed.2d 911, 918 (2015); *Harper v. The Oversight Comm. (In re Conco)*, 855 F.3d 703, 709 (6th Cir. 2017);

*In re Norenberg*, 554 B.R. 480, 483 (Bankr. D. Mont. 2016). This case has been referred to the bankruptcy court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss under §707(b) are core proceedings that this court may hear and decide. 28 U.S.C. §157(b)(1), (b)(2)(J) and (O); *Norenberg*, 554 B.R. at 482; *In re Floyd*, 534 B.R. 729, 731 (Bankr. N.D. Ohio 2015); *In re Rooney*, 436 B.R. 454, 455 (Bankr. N.D. Ohio 2010).

Having considered the Motion, the response and arguments of counsel, and having reviewed the entire record in this case, for the reasons stated below the court will grant the UST's Motion to Dismiss.

## BACKGROUND

Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code on July, 11, 2017, stating that their debts are primarily consumer debts. [Doc. #1, p. 6, Part 6, Q. 16a]. Debtors' Schedule D shows total secured debt in the amount of $234,947.26. [Doc. #1, p. 31]. Debtors' secured debt total includes a mortgage on Debtors' residence in the amount of $168,414.75. Also included are two vehicle loans, $31,237 on a 2014 Chevy Silverado, valued at $30,000, and $35,295.51 secured by a 2014 GMC Acadia, valued at $29,000.00 on the Schedules. [*Id.*] Debtors stated an intention to reaffirm on their mortgage and the loans secured by both motor vehicles [Doc. #1, p. 57]. Reaffirmation agreements have been executed and filed with the court for the mortgage [Doc. #26] and the loan secured by the 2014 GMC Acadia. [Doc. #33].

Debtors' bankruptcy schedules reflect no unsecured priority debt. [Doc. #1, p. 32]. Debtors' schedules show unsecured nonpriority debts in the amount of $72,445.91. [Doc. #1, p. 41].

Debtor-Husband is an Estimator/Project Manager for a plumbing and heating company. [Doc. #1, p. 44]. In the initial Schedule I, his gross income was listed as $5,633.33 per month. [Doc. #1, p. 44]. He has been employed in his present position for at least two years at the time of the hearing. Debtor-Wife has worked as a laborer for the previous five years, with listed gross income of $3,368.37 per month. [*Id.*]. Thus, Debtors' listed combined gross income totaled $9,001.70. Net income, after deductions for taxes, medicare, social security, insurance and voluntary retirement contributions, and the addition of a fuel reimbursement, was listed as

$6,374.15 per month.  [Doc. #1, p. 45].  Voluntary retirement contributions were listed as $338 a month for Debtor-Husband, and $202.11 for Debtor-Wife, totaling $540.11 per month.  [Id.]

Debtors' Schedule J shows two dependent children living in the household, ages five and two. [Doc. #1, p. 46].  Expenses listed on Schedule J total $6,277.86.  [Doc. #1, p. 47]. Subtracting expenses of $6,277.86 from net income of $6,374.15, the Debtors list "Monthly Net Income" of $96.29. [*Id*.].

On the Form 122A-1, the Chapter 7 "Means Test", the income of the Debtor-Husband was listed at a lower number - $5,475 [Doc. #1, p. 59], instead of the $5633.33 listed on Schedule I. Gross wages for the Debtor-Wife are listed as $3,329.74, which is $38.63 lower than the gross income listed on Schedule I. [*Id*.].  Based on the listed income figures, Debtors were above the median income level for a family size of four by an annual total of over $22,000.  [Doc. #1, p. 60].  After applying their expense deductions, Debtors listed monthly disposable income as negative $161.37. [Doc. #1, p. 68].

On September 22, 2017, approximately a week after the UST filed its Motion to Dismiss, Debtors filed Amended Schedules, in which they listed two additional secured creditors on Schedule D, on loans secured by personal property.  [Doc. #23, p. 5-6].  In addition, an Amended Schedule I listed reduced income for Debtor-Wife, in the amount of $3,013.01 per month, down from the $3,368.37 gross income listed on the original Schedule D, and the $3,329.74 listed on the Means Test. [Doc. #23, p. 8].  There was a minor corresponding reduction in the amount of taxes withheld, but an increase in her monthly voluntary retirement contribution to $210.90. [*Id*.]

An Amended Schedule J was also filed, changing some expense items.  The monthly child care expense was reduced from $950 to $750, reflecting that the oldest child was now in school, and only the younger child required regular day care.  [Doc. #23, p. 14, Line 7].  Expenses for clothing, laundry and dry cleaning were increased from $50 per month to $120 a month.  Spending on personal care products and services increased from $50 per month to $150 a month.  Expenses were also added for a loan secured by furniture, at $107.53 per month, and for school expenses of $30 per month.  In the Amended Schedules I and J, monthly net income was listed as being negative $260.90 per month.

At the Hearing on the UST's Motion, the Debtors presented very little testimony regarding their increased expenses listed on Amended Schedule J.  Debtors did testify regarding their child care expenses.  The records of the payment of those expenses constituted some notations on a

3

calendar. Debtors use a day care provider who is apparently unlicensed, and does not provide them with billing statements or payment records. This means that the Debtors incur an increased cost for child care, as they cannot claim the child care tax credit. Despite the cost, Debtors presented reasons why they favored their present child care arrangement, including its proximity to their home and flexible pick up hours.

There was testimony regarding the Debtor-Wife receiving less overtime opportunities, and the resulting decrease in income. However, it appears that Debtor-Wife was also working a different shift, with a "shift premium" that increased her hourly rate. Because of the lack of pay advices from the date of filing to the two pay advices with pay end dates of 9/30/17 and 10/14/17 [Ex. B], the court left the record open to allow the filing of additional pay advices, and arguments based upon those additional records. The parties were also encouraged to review, and if necessary correct, the court's calculations regarding the income received by Debtor-Wife from the date of the first filed pay advice that reflected her "year-to-date" income [Ex. 3-65] and the most recent two pay advices in Debtors' Exhibit B. In response, Debtors filed a Brief with attached exhibits. [Doc. #30 & 30-1]. The Brief attempts to argue that the court should consider a tornado that shut down the plant Debtor-Wife worked at as part of the evidence of record. The UST objected to that aspect of the Debtors' Brief, and the court will only consider the limited part of the evidentiary record that was left open – the additional pay advices.[1]

Parts of some of the copies of the post-hearing pay advices provided by Debtors are not legible. The pay advices with the last "pay end date" are through what appears to be 10/28/17. [Doc. #30, p. 9]. The year-to-date gross earnings for Debtor-Wife appears to total $33,085.90. [*Id*.] Debtors ask the court to consider the "most recent paystub which shows no overtime." [*Id.*, p. 1]. However, the pay advice with the "pay end date" of 9/30/17 reflects a small amount of overtime, plus "Reg Hours with Shift Premium". [*Id.*, p. 7]. Essentially, despite the Bankruptcy Code's emphasis on the previous six months, Debtors ask the court to extrapolate from the most recent two pay stubs.

---

1/ Debtors did not request reopening of the evidentiary hearing. *See generally, In re Moore*, 559 B.R. 243, 263-64 (Bankr. M.D. Fla. 2016). An additional reason to not consider Debtors' Counsel's statement regarding the tornado is that it not entirely clear that receiving unemployment, at approximately 60% of Debtor-Wife's pay [Doc. #30, p. 2], would adversely affect the Debtors' financial situation. Debtor-Wife's income is just over $3,000 a month, but has corresponding budget expenditures like $750 a month for child care [Doc. #23, p. 14], and the Debtors list a combined transportation expense of $690. [*Id*.]. In any event, if this case is dismissed (rather than converted), it will be without prejudice. Debtors can refile if their income was, in fact, reduced below the amount shown in the Amended Schedules.

The Debtors testified about the circumstances that led to the filing of this Chapter 7 case. The UST questioned the decision, in approximately 2012, to purchase a house with a substantially larger monthly mortgage payment than the house they had previously occupied. However, it appears that the new residence was purchased at about the time the couple had their first child. Moreover, there was testimony that Debtors did not experience financial difficulties until approximately two years later.

At some point, Debtor-Husband's employer stopped reimbursing him for expenses and he changed jobs to his present employer. This is one of the events that Debtors point to as being the cause of their financial difficulties. There was also a water leak in the Debtors' home, resulting in a water bill of about $3,000. In addition, Debtors cited a garnishment as a factor in their decision to file. They also testified that the sickness of one of their children in February and March of 2017 was a factor. The Debtors have medical insurance that covered the sick child. Debtors did not know how much they paid in expenses related to their son's sickness.

Much of the evidence presented by the UST focused on the events between 2014 and 2015. In 2014 (and perhaps early 2015), Debtors took out a number of personal loans, including a loan of $17,000 from a relative. The testimony regarding what was done with those funds was vague, and unhelpful. The responses to the UST's questions about what happened to these funds were a repetition of the assertion that the monies were used to pay bills.[2]

Similarly, in 2015, Debtor-Husband took out approximately $54,000 from his retirement account. It appears that the net amount received, after taxes, was in the neighborhood of $38,000. Credible testimony was presented that $18,000 went to pay off student loans. Debtors' responses to questions about the use of the remaining $20,000 from the retirement account were vague and unhelpful.

In 2015, while the Debtors were in the midst of their asserted financial difficulties, they purchased two vehicles – the 2014 Chevy Silverado and the 2014 GMC Acadia. To purchase those vehicles, they incurred $85,000 in secured debt. The monthly payments on the two vehicles are listed as $654 per month and $602 per month. [Doc. #23, p. 14]. Transportation costs are listed as $690 per month. [*Id.*]

---

2/ Similarly, Debtors could provide almost no information about what products or services they purchased in accumulating their unsecured debt.

The United States Trustee offered the testimony of Catherine Lowman ("Lowman"), employed as a bankruptcy auditor by the U.S. Trustee. She testified about Debtor-Husband's decision, reflected in his pay advices, to begin contributing to his retirement accounts in the months before filing this Chapter 7 bankruptcy. Contributions began in February of 2017 [Ex. 3-14] and were increased in late March, 2017. There was testimony that both Debtors are healthy and under 40 years old. Debtors acknowledge that they are making voluntary retirement contributions of approximately $540 per month, but assert that such contributions would not be permitted in calculating the monthly payments in a Chapter 13 (in this jurisdiction[3]) and thus should not provide a basis for a finding of "abuse" under §707(b)(3).

The Debtors' tax refunds reflect that they received refunds in the amount of $2,056 for the 2016 tax year [Ex. 5-6; Ex. I, p. 6], and even in 2015 - the year Debtor-Husband withdrew his retirement savings – Debtors received a tax refund of $802 [Ex. H, p. 8].

In closing, Debtors argued that the court should take into account that they have only saved approximately $300 since the filing, and are behind on the payments on one of their vehicles. However, during this period, Debtors were voluntarily contributing more than $540 a month to retirement accounts.

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. §707(b)(1). Under §707(b)(2) and (3), Congress provided two methods by which a party may prove abuse. As the movant, the UST carries the overall burden of demonstrating, by a preponderance of the evidence, that Debtors' case should be dismissed. *In re Weixel,* 494 B.R. 895, 901 (6th Cir. BAP 2013).

Section 707(b)(2)(A) sets forth an extensive "Means Test" calculation to determine whether there is a presumption of abuse. The Means Test calculation permits debtors to subtract certain allowed deductions from the debtors' "current monthly income". Where the Means Test calculation results in sufficient disposable income such that a presumption of an abusive filing

---

3/ This practice is not without controversy, based upon *dicta* in *Seafort*: "The Trustee "concedes" that if a debtor is making voluntary retirement contributions when the bankruptcy petition is filed, such continuing contributions may be excluded from disposable income. We do not agree with this assertion, for the reasons stated in *Prigge* [441 B.R. 667 (Bankr. D. Mont. 2010)]. However, our view is not relevant here, because this issue is not presently before us." *In re Seafort*, 669 F.3d 662, 674 n.7 (6th Cir. 2012).

17-32181-jpg    Doc 37    FILED 03/30/18    ENTERED 03/30/18 13:35:40    Page 6 of 10

arises, a debtor may rebut that presumption by demonstrating "special circumstances" as set forth in §707(b)(2)(B). Whether the presumption does not arise, or arises and is rebutted, the court may still dismiss a case for abuse under §707(b)(3).[4]

Under §707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances...of the debtor's financial situation demonstrates abuse." 11 U.S.C. §707(b)(3)(A) and (B). These provisions were added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under §707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in §707(b)(3). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under §707(b)(3), Congress lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *McGowan v. McDermott*, 445 B.R. 821, 824 n.5 (N.D. Ohio 2011); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). Also removed from §707(b) by the BAPCPA was the "presumption in favor of granting the relief requested by the debtor." *See*, *In re Witcher*, 702 F.3d 619, 622 (11th Cir. 2012); *In re Srikantia*, 417 B.R. 505, 508 (Bankr. N.D. Ohio 2009); *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).

## I. Is The Filing An Abuse Under Section 707(b)(3)'s Totality Of The Circumstances Test?

In this case, the UST does not argue that Debtors filed their Petition in bad faith. Instead, the UST asserts that the totality of Debtors' financial circumstances demonstrates that they are not needy and that granting the Debtor a discharge would be an abuse of the provisions of Chapter 7 under §707(b)(3). The "totality of the circumstances test" allows the court to consider both pre-petition and post-petition circumstances. *See, U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006)("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief,* which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the

---

4/ The UST's Motion to Dismiss only seeks relief under §707(b)(3). [Doc. #14].

7

discharge is granted."); *In re Ng*, 477 B.R. 118, 130-131 (9th Cir. 2012); *In re Mestemaker,* 359 B.R. at 855-56.

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126; *McGowan*, 445 B.R. at 824; *In re Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at *8 (Bankr. N.D. Ohio March 9, 2015). Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge,* 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see also, Krohn*, 886 F.2d at 126.

Debtors' Schedules show that they are eligible to be debtors under Chapter 13. Their secured and unsecured debts are less than the Chapter 13 debt limits. *See*, 11 U.S.C. §109(e). Debtors have regular income that, at the time of the Hearing, appeared to be relatively stable, although it was asserted that Debtor-Wife's opportunities for overtime had been reduced.

Under §707(b)(3), the UST argues that Debtors have sufficient disposable income to repay at least a portion of their unsecured debts out of future earnings, in a Chapter 13 plan or otherwise. The UST argues that Debtors' ability to make voluntary retirement payments suggests that Debtors have more disposable income than their Petition represents, and that these retirement contributions should instead be "applied to a ratable distribution among all Debtor's unsecured creditors." *Robinson*, 2015 WL 1087316 at *3, 2015 Bankr. LEXIS 719 at **10-11. However, "the totality of a debtor's individual circumstances must be considered in determining whether a debtor's [retirement] contributions and repayment of [retirement] plan loans are reasonably necessary expenses in a §707(b)(3) analysis." *Robinson*, 2015 WL 1087316 at *4, 2015 Bankr. LEXIS 719 at **11-12. Relevant factors include: "(1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings (3) level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) needs of any dependents; and (7) other constraints that

8

make it likely that retirement contributions are reasonably necessary expenses for this particular debtor." *Id*.; *In re Beckerman*, 381 B.R. 841, 848 (Bankr. E.D. Mich. 2008).

Here, Debtors pay retirement contributions total more than $540 per month. In *Behlke*, the Sixth Circuit Court of Appeals affirmed the bankruptcy court's holding that monthly 401K contributions of $460 a month[5], or 6% of debtor's pay, should be included in disposable income. *Behlke*, 358 F.3d at 436 ("We agree completely and find no clear error in the bankruptcy court's finding that the 401K contribution in this case was not reasonably necessary to the maintenance and support of the debtors or their dependent and that it should be included as disposable income.")

Even accepting the reduction in Debtor-Wife's income reflected in Amended Schedule I, and the increased expenses that the Debtors were "shortchanging themselves on" in Amended Schedule J, the negative disposable income number of $260.90 per month [Doc. #23, p. 14] becomes disposable income of $288 per month when the retirement contributions of $338 and $210.90 [Doc. #23, p. 8] are removed.

The "presumption of abuse" level in 11 U.S.C. § 707(b)(2)(A)(i)(II) is currently at $12,850 over 5 years, or about $215 a month over 60 months. The Debtors here have disposable income in excess of that amount, even ignoring the history of tax refunds. *See*, *In re Mestemaker*, 359 B.R. at 858 ("This court does not necessarily agree that abuse or lack of abuse based on the totality of a debtor's actual financial circumstances under §707(b)(3) must be determined by application of the 'abuse threshold' established for purposes of the means test construct in § 707(b)(2). But the 'abuse threshold' is at least a helpful guideline relative to Congress's intentions in giving content to the concept of abuse under §707(b)(1)."); *In re James*, 414 B.R. 901, 915 (Bankr. S.D. Ga. 2008)("the abuse threshold fixed in § 707(b)(2)(A) is a helpful tool for determining whether a case should be dismissed for abuse under § 707(b)(3)(B).... We should pay close attention to the standard, but not become slave to it.").

While the court can find that the totality of the circumstances do not support a finding of abuse, even when there is disposable income in excess of the threshold, there is little in the way of counterbalancing facts here. Debtors have a budget that does not reflect significant belt tightening. During a period when they describe being in financial distress, they spent $85,000 on motor vehicles. As bankruptcy approached, Debtors made the decision to add an additional

---

5/   *Behlke*, 358 F.3d at 432 ("13. Debtors' Schedule I-Current Income of Individual Debtor(s) shows a voluntary monthly contribution of $460.00 to William Behlke's employer sponsored 401K plan.").

17-32181-jpg    Doc 37    FILED 03/30/18    ENTERED 03/30/18 13:35:40    Page 9 of 10

expense of $338 per month to their budget in the form of voluntary retirement contributions. Moreover, if the liquidation of the retirement account in 2015 actually benefitted creditors, the court was not provided proof of it. The Debtors were unable to provide any specific information when questioned about how or where those monies were applied.

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's Motion to Dismiss [Doc. #14] will be **GRANTED**, and this case will be dismissed without prejudice, by separate order of the court.

###

10